No. 35,702

THE STATE OF KANSAS, *Appellee*, v. SAM ALLEN, *Appellant*.

(137 P. 2d 163)

Opinion filed May 8, 1943.

A. C. *Wilson*, of Oskaloosa, and *Maurice O'Keefe*, of Atchison, were on the briefs for the appellant.

A. B. *Mitchell*, attorney general, *William P. Timmerman*, assistant attorney general, and *James F. Swoyer*, county attorney, were on the briefs for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: Sam Allen and W. W. Smith were jointly charged with the theft of three hogs belonging to Norman Ham in Jefferson county. Separate trials were granted; both were convicted under G. S. 1935, 21-533, and Allen appeals.

At the outset we must note that neither counsel has briefed this case according to the rules authorized by statute which among other details requires a full statement of the essential facts of the case. (G. S. 1935, 60-3825, 60-3826; G. S. 1941 Supp. 62-1724, 62-1726, 62-2601.) From a diligent study of the transcript, however, together with a plethora of photographs designed to portray the *locus in quo*, it appears that Norman Ham is a farmer who resides about seven miles south of Oskaloosa not far from Highway No. 59. The defendant Sam Allen resides on a farm situated on both sides of the same highway near to and perhaps adjacent to the Ham farm. W. W. Smith is a neighbor of Allen's and occasionally has done some truck-hauling for him. Early in 1942 Ham began to miss some of his hogs, which prompted him and his hired man to make frequent counts of their number. On the evening of April 14, 1942, the Ham hogs were counted. The following morning another count showed that three hogs were missing. Ham telephoned the sheriff who with one of his deputies came and set about an examination of the premises. They and Ham found footprints coming to and going from Ham's hogpens towards Allen's place, and also fresh hog droppings leading from that pen to a hog loading chute beside the barn on the Allen farm. They also saw fresh tire treads at the hog chute, indicating that a truck had recently been there. The Kansas Bureau of Investigation, which specializes in investigation of the theft of livestock, was notified, and it sent one or more of its staff to assist in the search for evidence and in running down the criminal or criminals who had stolen the hogs. Careful examination of the footprints was made, including one or more plaster casts of them. Inquiries at neighboring towns about the possible marketing of hogs that morning, April 15, were made; and it was ascertained that the Morrell packing company in Topeka had bought three hogs early that morning from W. W. Smith. Ham and his hired man went to Topeka and readily identified the three stolen hogs out of a large number in the stockpens. The footprints leading to and from the Ham hogpen to that of Allen's hog-loading chute were shown to correspond with

those of Allen and Smith, wherever such footprints were sufficiently clear to be measured and compared with the shoes worn by Allen and by Smith. Other evidential incidents tending to show that Allen and Smith had perpetrated the crime need not be detailed here. Smith was arrested, and later the arrest of Allen followed.

Following their separate convictions, Allen brings his case here, urging certain errors, the first of which is based on the overruling of appellant's motion to require the sheriff to return to him the pair of shoes he was wearing at the time of his arrest. Included in the same motion was a demand for the return of $38 taken from the defendant's person. The money was ordered returned, but as to the shoes the court ruled "that the said . . . [sheriff] . . . be and he is hereby ordered to retain the possession of said shoes until the further order of this court."

At the trial the state attached considerable significance to the condition of the shoes, and there was evidence tending to show that defendant had pared off some of the rubber heels and had attempted to alter the imprint on the ball of the sole of one of the shoes, and that this had been done after defendant learned that the officers of the law were seeking to trace the footprints of the hog thieves leading from the hogpen on the Ham farm.

Precedents can be found in the lawbooks that the forcible abstraction of a defendant's property will bar its use as evidence in a criminal prosecution, but the well-reasoned majority view, which is to the contrary, is tersely stated in 1 Wharton on Criminal Evidence, 11th ed., section 271, in part, as follows:

"Many jurisdictions support the proposition that the admission in evidence of shoes taken forcibly from the person of one under arrest for commission of a crime, or of the result of a comparison of the tracks with the shoes so obtained, for the purpose of identifying him with the person who made tracks found near the scene of the crime, does not violate the rule against self-incrimination. It has also been held that the constitutional provision against unreasonable searches and seizures does not prevent the introduction of evidence of a comparison of footprints with shoes forcibly taken from one accused of crime." (p. 344.)

See, also, exhaustive annotations on this subject in 24 A. L. R. 1408; 32 *id.* 408; 41 *id.* 1145; 52 *id.* 477; 88 *id.* 348; and 134 *id.* 819.

Counsel for defendant cite *State v. Smithmeyer,* 110 Kan. 172, 202 Pac. 638, in which we held that the state was not entitled to retain certain documents which had been produced for the attorney-general's inspection in obedience to a subpoena *duces tecum*—the excuse

for their retention being their possible probative value in an anti-trust suit then pending against a corporation of which the subpoenaed witnesses were officers or employees. We think a careful reading of the opinion should reveal a clear distinction between that case and the matter urged as error in the one at bar. And see *Smithmeyer v. Hopkins*, 111 Kan. 329, 207 Pac. 655, which was a sequel to the Smithmeyer case just cited. In the case at bar the state's witnesses could have testified as to the appearance of the shoes. That testimony might be untrue, but the actual condition of the shoes themselves, when they were shown in evidence, was not only competent but was better and more reliable evidence than a verbal description of their condition could possibly be. The court holds that the overruling of the motion for the peremptory return of the shoes before they could be availed of as evidence was not error.

The second error urged is based upon the introduction of the shoes in evidence—that this was in effect compelling defendant to be a witness against himself in violation of constitutional guaranties. (Bill of Rights, Kan. Const., § 10; U. S. Const., 14th Amdt., § 1.) In the notable homicide case of *State v. Turner*, 82 Kan. 787, 109 Pac. 654, 32 L. R. A., n. s., 772 and note, where error was assigned on the introduction in evidence of a revolver which the defendant was compelled by intimidation to produce from a place where he had concealed it, this court, speaking by the late Mr. Justice Henry Mason, said:

"So far as concerns the rule that the accused shall not be required to be a witness against himself, evidence extorted from him by intimidation stands upon the same footing as though it had been procured by force, or by any other unfair or illegal method. It has already been decided by this court that articles of which the prosecutor has obtained possession by unlawful means— for instance, by seizure without process—may be introduced in evidence over the objection of a defendant whose rights have been thus violated. (*State v. Miller*, 63 Kan. 62.) The rule authorizes the use as' evidence, not only of articles taken by force, but also of those which the defendant has been coerced into delivering. The manner of their procurement, however reprehensible, will not prevent their use as evidence so long as the person against whom they are used has not been constrained by the court to produce them. A document that has been taken stealthily from the defendant's desk, or forcibly from his pocket, or that he has surrendered under a threat of personal violence, may be used against him, because its wrongful procurement creates no estoppel, and the story it tells is its own and not that of the defendant. But if he produces it in obedience to an order of the court it is incompetent, because under such circumstances his act is performed in the capacity of a witness and to admit

the fruits of it as evidence would be to make use of him as a witness against himself. . . .

"True, in receiving as evidence information unlawfully obtained, a court may seem by judicial sanction to encourage wrongdoing. But such is not the real aspect of the matter. The sole question under investigation in a criminal trial is the guilt or innocence of the defendant. Nothing not pertinent to that subject can be considered. Everything throwing light upon it should be admitted, unless forbidden by some rule of law." (pp. 792-794.)

See, also, *State v. Kelley*, 125 Kan. 805, 265 Pac. 1109; *State v. Razey*, 129 Kan. 328, 331, and citations, 282 Pac. 755; and 8 Wigmore, 3d ed., § 2183.

The third error assigned is based on defendant's contention that the evidence against him was "almost 100% circumstantial" and that it was not so full and complete as to be inconsistent with any rational conclusion other than that of his guilt under the familiar rule stated in *State v. Andrews*, 62 Kan. 207, 61 Pac. 808, and often repeated in our reports. To this we think there are two answers. A careful perusal of the record shows that the circumstantial evidence was amply sufficient to take the case to the jury under proper instructions, and counsel for defendant candidly says in his brief that the court's instructions—"perhaps a little too briefly yet correctly instructed the jury in this case on the question of circumstantial evidence." A second answer to the same contention is that a very substantial part of the evidence tending to show defendant's guilt was not circumstantial, but direct and positive, such as that given by Smith, which in part reads:

"Q. Did you have a conversation with Allen while you were in jail? A. Had a lot I guess.

"Q. Would you give the conversation? A. I told him I loaded the hogs there, [at Allen's chute], he said for me not to tell, that I was stuck any way.

"Q. What did he tell you to say about loading the hogs? A. Told me not to tell where I loaded them.

"Q. How many times did he talk to you about that? A. Several times.

"Q. Did he wake you up to tell you those things? A. Once or twice. Told me to say they were not loaded at his place."

A patient study of this entire record shows nothing amounting to the gravity of even minor error. No substantial ground was urged in support of defendant's motion for a new trial; and judgment was correctly imposed pursuant to the jury's verdict.

The judgment is affirmed.